IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| **TERRESSA WILLIAMS,** et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) CIVIL ACTION NO. **5:20-cv-00234-MTT** |
| **ETHICON INC.,** et al., | ) ) ) |
| Defendants. | ) |

**PLAINTIFFS' TRIAL BRIEF**

**COME NOW** Terressa Williams and Russell Williams, Plaintiffs in the above-styled action, and submit this their Trial Brief, showing the Court the following:

**I.      STATEMENT OF THE CASE**

**A.      The Parties**

This trial involves Plaintiffs' product liability and related claims against defendants Ethicon, Inc. and Johnson & Johnson (collectively "Ethicon").[1] On October 10, 2005, Plaintiff Terressa Williams was implanted with an Ethicon Prolift Total Pelvic Repair System. The operation was performed by Dr. Richard Heaton at Houston Medical Center in Warner Robins, Georgia. At all times relevant to this case, Plaintiff Russell Williams has been the husband of Plaintiff Terressa Williams. As Plaintiffs will

---

[1] Ethicon is a wholly-owned subsidiary of Johnson & Johnson. By stipulation Johnson & Johnson is jointly liable with Ethicon for any judgment entered against Ethicon.

1

demonstrate at trial, Ethicon did not adequately inform Plaintiff Terressa William's implanting surgeons of the risks associated with the Prolift device. Consequently, the implanting surgeons were not in a position to disclose those risks to the Plaintiffs, and the Plaintiffs were thus injured.

**B.    The Prolift**

The Prolift Total Pelvic Floor Repair System ("Prolift") was designed to treat pelvic organ prolapse ("POP"). Prolapse occurs when the body's support for the bladder, rectum, intestine and/or uterus is weakened, allowing an organ to bulge/drop into the vagina. The Prolift procedure involves the insertion of a *massive* mesh implant with large mesh arms that extend down into the depths of the pelvis, ostensibly to provide support for the prolapsed organ(s). Plaintiff Terressa Williams underwent a "Total Prolift" to support both her bladder and rectum. Plaintiff Terressa Williams received the maximum amount of mesh, with 6 total arms (4 anterior, 2 posterior). As designed by Ethicon, the mesh and arms are introduced and then pulled through the vagina and pelvis, including anatomical areas that had no defect or weakness whatsoever, by use of large, sharp trocars. The mesh arms are then pulled out through skin incisions in the groin and buttocks.

Ethicon first placed the Prolift on the market in March 2005. Prior to that, Defendants conducted two clinical studies:

- The Gynemesh PS Study[2] was a study of the mesh material itself inserted in various ways (but <u>not</u> through the Prolift procedure); and

- The TVM Studies, performed in a French arm and a US arm, in which the shape of the mesh material was similar to the ultimate design of the Prolift, and inserted through various instruments (<u>not</u> the trocars ultimately used in Prolift procedures).

The data from both studies showed significant complications at alarming frequency, and failed their primary endpoint, or main objective, which was 20% or less anatomic recurrence of prolapse. In fact, based on Ethicon's own protocols, the Prolift should not have gone to market due to the recurrence rate seen in its TVM studies. But Ethicon ignored its own internal cutoffs and took the product to market.

At trial, Plaintiffs will demonstrate that Ethicon's commercial goals were a significant motivation in deciding to ignore their safety and efficacy concerns about the Prolift. Specifically, Ethicon was pursuing what it perceived to be a market of hundreds of millions of dollars and it was rushing to market on the heels of its competitor, American Medical Systems ("AMS"), which previously began marketing similar, competitive prolapse mesh kits known as the Apogee and Perigee.

Very soon after the Prolift was released, Ethicon began to accumulate data and information from surgeons about Prolift mesh and procedure complications, including particularly intractable, untreatable, pain and dyspareunia (painful sexual intercourse). This led Ethicon to develop and market the Prolift +M, a product Defendant billed as a

---

[2] The mesh material was originally sold as abdominal *hernia* mesh under the name Prolene Soft, then as a flat mesh to be cut by the doctor and used as needed under the name Gynemesh PS.

more "natural," and safer, alternative to the Prolift products. The Prolift +M used the same surgical technique and instruments (trocars) as the Prolift, but it varied from the original Prolift in that the mesh was partially absorbable (+M signifies the Monocryl component, which was absorbable). The goal of the Prolift +M was to leave less mesh material, with larger pores and lighter weight, in a woman's body thereby reducing the inflammatory reaction, resultant scarring, and other complications.

Ultimately, Ethicon ceased marketing and selling the Prolift and Prolift +M. On September 1, 2012, Ethicon also changed the warnings (indications) for the Prolift's predecessor product, Gynemesh PS, to indicate for abdominal placement *only* (removing vaginal placement from the indications). (See fn. 2 supra).

C.      **Plaintiffs' Damages**

In this case, Plaintiff Terressa Williams has endured persistent complications, pain, disruption of her life, and significant medical and surgical treatment, including but not limited to the following:

- Mesh contraction and deformation with scarring due to CFBR,
- chronic inflammation,
- mesh erosion requiring revision surgery,
- recto-vaginal fistula requiring ileostomy and subsequent reversal,
- risk of future mesh erosion,
- risk of future urinary complications,
- risk of future fistula,
- mesh excision procedure,
- painful sexual intercourse,
- vaginal pain,
- chronic pelvic pain, and
- urge incontinence of feces

Plaintiff Russell Williams asserts loss of consortium claims, as the injuries caused by Defendants' products have deeply impaired all facets of his relationship with his wife and required him to provide regular care for his wife's medical complications resulting from the Prolift.

**D.     Overview of Plaintiffs' Claims**

In this action, Plaintiffs assert claims of negligence/defective design, failure to warn, and loss of consortium.  Additionally, Plaintiffs assert a claim for punitive damages.

**Negligence/Design Defect**.  "In a negligent design case, the risk-utility analysis applies to determine whether the manufacturer is liable." Ogletree v. Navistar Intl. Transp. Corp., 271 Ga. 644, 645 (1999).  The risk-utility analysis is "a test balancing the risks inherent in a product design against the utility of the product so designed. … [U]nder the risk-utility analysis for the determination whether a manufacturer should be liable for an entire product line, no finite set of factors can be considered comprehensive or applicable under every factual circumstance, since such matters must necessarily vary according to the unique facts of each case." Banks v. ICI Americas, 264 Ga. 732, 735-736 (1994).  "The factfinder may consider a number of factors, including the usefulness of the product, the gravity and severity of the danger caused by the design, the avoidability of the danger, the efficacy of any warnings, the ability to eliminate the danger without impairing the product's usefulness, and the user's ability to avoid the danger." Bryant v. Hoffmann-La Roche, Inc., 262 Ga. App. 401, 409 (2003). "[A] manufacturer's proof of compliance with industry-wide practices, state of the art, or federal regulations does not eliminate conclusively its

liability for its design of allegedly defective products." Kelley v. Hedwin Corp., 308 Ga. App. 509, 512 (2011) (quoting Banks, 264 Ga. at 736-737, n. 6.)

While a central factor to be considered in a risk-utility analysis is the availability of an alternative safer design, "[i]t is important to note, however, that . . . the [Banks] court did not hold that a jury *must* consider this factor. The Supreme Court instead held that the jury '*may* consider evidence establishing that at the time the product was manufactured, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible.'" S K Hand Tool Corp. v. Lowman, 223 Ga. App. 712, 715 n.1 (1996) (citing Banks, 264 Ga. at 736) (emphasis in original).[3]

**Failure to Warn**. "[A] product defect claim based on failure to warn of danger posed by the product requires warnings of foreseeable dangers from the normal use of the product." Woods v. A.R.E. Accessories, 345 Ga. App. 887, 890 (2018). Significantly, a product manufacturer has a post-sale duty to warn consumers of dangers inherent in its products. "Georgia law imposes a continuing duty upon manufacturers to warn of a danger arising from a product after its sale or distribution." Ford Motor Co. v. Reese, 300 Ga. App. 82, 85 (2009). Here, Ethicon has admitted it knew all of the risks associated with the Prolift devices before they were marketed. Piet Hinoul, M.D., who joined Gynecare in 2008 as a worldwide medical director, confirmed that on the day of the Prolift launch, Ethicon was aware of potential complications, such as urinary incontinence, urinary retention or

---

[3] Plaintiffs have also asserted a claim for gross negligence based upon the same evidence. Under Georgia law, "gross negligence" is defined as "the absence of even slight diligence, and slight diligence is defined in [O.C.G.A. § 51-1-4] as 'that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.'" Gliemmo v. Cousineau, 287 Ga. 7, 12-13 (2010).

obstruction, ureteral obstruction, voiding dysfunction, pain, pelvic pain, and pain with intercourse.  See Hinoul 4/6/12 Trans., Exhibit **"1"**, at 388-399; Hinoul 9/18/12 Trans., Exhibit **"2"**, at 679-682).  Charlotte Owens, M.D., Ethicon's worldwide medical director from 2003 to 2005, testified that she knew about the risks of dyspareunia and severe pain, but did not include them in Ethicon's warnings.  See Owens 9/12/12 Trans., Exhibit **"3"**, at 141-148).  Likewise, Axel Arnaud, M.D., Gynecare's scientific director in Europe from 2001 to 2008, acknowledged that he was aware of problems with Prolift before it went on the market and that he was aware of the potential risks of mesh erosion, pain, and dyspareunia, as well as the need to improve the mesh material.  See Arnaud 11/15/12 Trans., Exhibit **"4"**, at 183-193).  Owens, Arnaud and Hinoul acknowledged that potential complications such as mesh retraction, dyspareunia, and severe pain, as well as the difficulty of mesh removal, were known at the time of Prolift's launch, but were not mentioned by name in the IFU.

**Learned Intermediary Doctrine**.  The learned intermediary doctrine is recognized under Georgia law and, if applicable, relieves a manufacturer of its usual duty to directly warn the ultimate consumer, Plaintiff Terressa Williams.  However, the learned intermediary doctrine *only* applies when the product's warning is adequate.  "[U]nder the learned intermediary doctrine, the manufacturer's warnings to the physician must be adequate or reasonable under the circumstances of the case." McCombs v. Synthes, 277 Ga. 252, 253 (2003).

While Plaintiff Terressa Williams' implanting surgeon, Dr. Heaton, was generally aware of the risk of several complications that the Prolift mesh could cause at the time he

7

implanted Prolift in Plaintiff Terressa Williams, he was not aware that the mesh scar tissue could contract, cause chronic inflammation, lifelong painful intercourse, and chronic pain as suffered by her. (Heaton Depo., Ex. **"5"**, at pp. 91, 95-96, 102, 107). Since Dr. Heaton was unaware of these risks at the time he discussed the procedure with Mrs. Williams prior to her surgery in 2005, he was unable to pass them along to her and therefore unable to obtain her fully informed consent. Both Drs. Niall Galloway and Abbas Shobeiri, in their expert reports in this case, have opined to a reasonable degree of medical certainty that Mrs. Williams' problems and complications underlying her claims in this action are a direct result of the Prolift mesh that was implanted in her.

It is evident from Dr. Heaton's testimony that he was not adequately informed as to all the risks associated with Prolift, particularly those related to Mrs. Williams' injuries. While Dr. Heaton appears to stand by his use of Prolift in Mrs. Williams in 2005, his position is based only on the information he had at the time:

> Q. Dr. Heaton, in terms of standing by your decision to use the Prolift in October, 2005, do you stand by that decision?
>
> A. Yes, *because I didn't have the knowledge I had later*.

(Id. at p. 74, emphasis added).

> Q. Doctor, do you stand by your decision to recommend and use the Prolift with Ms. Williams in October, 2005?
>
> A. *With the knowledge that I had then* – Yes, absolutely.

(Id. at p. 75, emphasis added).

The crux of Plaintiffs' failure to warn claim is that Defendants failed to adequately inform physicians, such as Dr. Heaton, of the risk of problems and complications such as

those experienced by Mrs. Williams. Dr. Heaton has testified that he was never advised by Defendants that Prolift scar tissue could shrink (Id. at p. 96), that Prolift could cause chronic inflammatory processes that would subsequently lead to erosions (Id. at p. 102), that Prolift could cause some women to have complications that would be completely untreatable (Id. at p. 107), or that Prolift could cause severe lifelong problems, including painful intercourse (Id. at pp. 91, 95-96). Importantly, Dr. Heaton testified that, had he known of all these risks, he would not have used the product in Mrs. Williams:

> Q. And you had never been told by Ethicon or the IFU [Instructions For Use] that some women would have complications that would be completely untreatable from the insertion of Prolift?
>
> [Counsel objection.]
>
> A. No, I had not heard that.
>
> Q. And, certainly, if you had, you would have passed that onto your patient?
>
> [Counsel objection.]
>
> A. *I'd have probably looked for something else to do*, because I'd never want to do something that would permanently damage somebody.

(Id. at p. 107, emphasis added).

The learned intermediary doctrine therefore does not bar Plaintiffs' failure to warn claims by severing the causal connection between Defendants' negligently designed product and Plaintiffs' harm. As Dr. Heaton testified, had he been made aware by Defendants of the full extent of the risks associated with Prolift, he would not have used it with Mrs. Williams.

There is substantial and undisputed evidence that Ethicon failed to warn of risks associated with Prolift that were known to the company. Additionally, Ethicon

9

misrepresented the risks associated with the Prolift by, *e.g.*, stating that the mesh causes only a transient foreign body reaction, despite Defendants' admitted knowledge that it causes a chronic, severe foreign body and inflammatory reaction. If the jury finds these warnings to be inadequate, the learned intermediary doctrine cannot be applied and Defendants' duties must be determined in accordance with general principles of tort law.

**Loss of Consortium**. Plaintiff Terressa William's husband, Russell Williams, will establish loss of consortium. As this Court is aware, consortium means "the marital rights and duties of the spouses inter se, the reciprocal rights and duties of society, companionship, love, affection, aid, services, cooperation, sexual relations, and comfort, such being special rights and duties growing out of the marriage covenants." W. J. Bremer Co. v. Graham, 169 Ga. App. 115, 116 (1983) (citation and emphasis omitted). "Damages for loss of consortium are not capable of exact pecuniary measure and must be left to the enlightened conscience of impartial jurors taking into consideration the nature of the services, society, companionship and all the circumstances of the case." Mortensen v. Fowler-Flemister Concrete, 252 Ga. App. 395, 397 (2001) (punctuation and footnote omitted). "Although consortium includes sexual relations, it also includes nonsexual aspects of a marital relationship." Lee v. Thomason, 277 Ga. App. 573, 577 (2006).

**Punitive Damages**. Plaintiffs will be seeking the award of punitive damages pursuant to O.C.G.A. § 51-12-5.1. "In a case in which the cause of action arises from product liability, the risk falls on society as well as on the individual plaintiff who has been harmed. Because of the potential ability to damage numerous citizens, the defendant

may be punished by the imposition of unlimited damages, but this may occur only one time." Mack Trucks v. Conkle, 263 Ga. 539, 542 (1993).

"In product liability actions, evidence of other incidents involving the product is admissible, and relevant to the issues of notice of a defect and punitive damages, provided there is a showing of substantial similarity." Volkswagen of Am. v. Gentry, 254 Ga. App. 888, 895 (2002). Punitive damages verdicts have been returned in other mesh-related cases in the past several years in other jurisdictions:

- Perry v. Ethicon Inc., No. S-1500-279123 (Cal. Super. Ct. April 27, 2015) ($5 million punitive damages verdict against Ethicon for personal injuries caused by TVT-A).

- Hammons v. Ethicon, Inc., No. 03913, (Phila. Cnty. Ct. C.P. Sept. 30, 2016) ($7 million punitive damages verdict against Ethicon for personal injuries caused by Prolift).

- Carlino v. Ethicon, Inc., No. 03470 (Phila. Cnty. Ct. C.P. Feb. 10, 2016) ($10 million punitive damages verdict against Ethicon for personal injuries caused by TVT product).

- Engleman v. Ethicon, Inc., No. 1403-05384 (Phila. Cnty. Ct. C.P. Apr. 28, 2017) ($17.5 million punitive damages verdict against Ethicon for personal injuries caused by TVT-S product).

- Ebaugh v. Ethicon, Inc., No. 1307-00866 (Phila. Cnty. Ct. C.P. Sept. 7, 2017) ($50 million punitive damages verdict against Ethicon for personal injuries caused by TVT-S product).

- Hrymoc v. Ethicon, Inc., No. L-13696-14, (N.J. Super. L. Div., Bergen Cnty. Dec. 14, 2017) ($10 million punitive damages verdict against Ethicon for personal injuries caused by Prolift and TVT-O).

- Emmett v. Ethicon, Inc., No. 1307-01495 (Phila. Cnty. Ct. C.P. Jan. 31, 2019) ($25 million punitive damages award against Ethicon for personal injuries caused by Prolift and TVT-O).

- <u>Kaiser v. Ethicon, Inc.</u>, 947 F.3d 996 (7th Cir. 2020) (affirming punitive damages award of $10 million against Ethicon for personal injuries caused by Prolift).

In this case, similar evidence will be presented at trial that, under Georgia law, is more than sufficient to support a punitive award.

Dated: May 13th, 2021


*/s/ Jeremy McKenzie*
Jeremy S. McKenzie  (GA Bar 435566)
R. Paul Hart  (GA Bar 333694)
C. Dorian Britt (GA Bar 083259)

**KARSMAN, MCKENZIE & HART**
21 W Park Ave
Savannah, GA 31401
Tel 912-335-4977
Fax 912-388-2503
jeremy@kmtrial.com
paul@kmtrial.com

*/s/ Andrew N. Faes*
Andrew N. Faes (admitted Pro Hoc Vice)

**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: (816) 701-1100
Facsimile: (816) 531-2372
afaes@wcllp.com

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **TERRESSA WILLIAMS,** et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. **5:20-cv-00234-MTT** |
| | ) | |
| **ETHICON INC.,** et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of May, 2021, I electronically filed the foregoing document on the Court's CM/ECF filing system, thereby sending notice of said filing to all counsel of record in this matter.

*/s/ Jeremy McKenzie*
Jeremy S. McKenzie  (GA Bar 435566)
*jeremy@kmtrial.com*

**KARSMAN, MCKENZIE & HART**
21 W Park Ave
Savannah, GA 31401
Tel 912-335-4977
Fax 912-388-2503

*Counsel for Plaintiffs*