# EXHIBIT 1

```
00351
  1                        - - -
  2                                    : SUPERIOR COURT OF
                                       : NEW JERSEY
  3    IN RE:                          : LAW DIVISION -
       PELVIC MESH/GYNECARE            : ATLANTIC COUNTY
  4    LITIGATION                      :
                                       : MASTER CASE 6341-10
  5                                    :
                                       : CASE NO. 291 CT
  6
         CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
  7                   CONFIDENTIALITY
  8                        - - -
  9               Friday, April 6, 2012
 10                    VOLUME II
                           - - -
 11
 12          Transcript of the continued deposition of
 13    PIET HINOUL, M.D., Ph.D., called for Videotaped
 14    Examination in the above-captioned matter, said
 15    deposition taken pursuant to Superior Court Rules of
 16    Practice and Procedure by and before Kimberly A.
 17    Overwise, a Certified Realtime Reporter, Registered
 18    Professional Reporter, Certified Court Reporter, and
 19    Notary Public, at Riker Danzig Scherer Hyland
 20    Perretti LLP, Headquarters Plaza, One Speedwell
 21    Avenue, Morristown, New Jersey, on the above date,
 22    beginning at 9:07 a.m.
 23                        - - -
 24              GOLKOW TECHNOLOGIES, INC.
           877.370.3377 ph | 917.591.5672 fax
 25                   deps@golkow.com
```

```
00388
 1   humans of a product like the ProliftÆ when it's been
 2   tested by R&D?  Who decides that question?  Is it
 3   medical affairs and others?  If it's others, who?
 4        A    Yes, so I would have to defer to the
 5   people that have control of this process, of the
 6   design process.  But it is never one signature on a
 7   document that everybody is in agreement with.  We
 8   contribute to the human factor.
 9        Q    In terms of the clinical significance of
10   test results created by or accumulated by research
11   and development, medical affairs would determine the
12   clinical significance in terms of how is this going
13   to impact on humans?
14        A    Yes.
15        Q    Okay.  Can you go to Exhibit 619, please.
16             MR. SNELL:  Do you have a copy, Adam?
17             MR. SLATER:  I do.  I actually do.
18             MR. SNELL:  Thank you.  619?
19             MR. SLATER:  619.
20   BY MR. SLATER:
21        Q    And if you could, turn to the second page.
22   You see an e-mail from Axel Arnaud to Ophelie
23   Berthier dated January 11, 2005?  Do you see the
24   e-mail?
25        A    Yes.
```

```
00389
 1          Q    Okay.  And you see that Axel Arnaud about
 2     two months before the ProliftÆ was launched proposes
 3     to add a warning to the IFU for the ProliftÆ?  Do
 4     you see that?
 5          A    Yes, I see it.
 6          Q    I'm going to read it and then ask you a
 7     couple questions.  Okay?  It says:  "WARNING:  Early
 8     clinical experience has shown that the use of mesh
 9     through a vaginal approach can occasionally/
10     uncommonly lead to complications such as vaginal
11     erosion and retraction which can result in an
12     anatomical distortion of the vaginal cavity that can
13     interfere with sexual intercourse."
14               Reading correctly so far?
15          A    Yes.
16          Q    "Clinical data suggest the risk of such a
17     complication is increased in case of associated
18     hysterectomy.  This must be taken in consideration
19     when the procedure is planned in a sexually active
20     woman."
21               You see that?
22          A    Yes.
23          Q    You would agree with me that Axel Arnaud
24     was very knowledgeable about the TVM procedure as it
25     was going to be used with the ProliftÆ; correct?
```

```
00390
  1          A    Correct.
  2          Q    And if Axel Arnaud suggested that this
  3     warning should be placed in the ProliftÆ IFU, from
  4     the perspective of medical affairs, that's necessary
  5     and should be done before the product is sold for
  6     use in patients; correct?
  7               MR. SNELL:  Objection; form.
  8               THE WITNESS:  It is a suggestion.
  9     BY MR. SLATER:
 10          Q    Well, when medical affairs suggests that a
 11     warning such as this be placed into the IFU, medical
 12     affairs is saying this is necessary to help protect
 13     patients; right?
 14          A    Yes.  And I'm sure there was discussion
 15     ensuing this e-mail.
 16               MR. SLATER:  Move to strike after the
 17     word "Yes."
 18     BY MR. SLATER:
 19          Q    Certainly medical affairs would expect
 20     that if a warning of this significance would be
 21     recommended by medical affairs to be put in the
 22     ProliftÆ IFU, that the people who are handling the
 23     day-to-day work on the project would take very
 24     seriously what medical affairs recommended and would
 25     include that in the IFU; right?
```

```
00391
 1                  MR. SNELL:  Objection; form.
 2                  THE WITNESS:  I am sure they take our
 3    suggestions seriously and I'm sure they took Axel
 4    Arnaud's suggestions seriously.  But the fact is
 5    that we felt that in the instructions for use, the
 6    way the complications were stated, this was already
 7    implied.
 8    BY MR. SLATER:
 9        Q    And that's why you think this wasn't used?
10        A    And that is why eventually it didn't go
11    into the IFU.  Because also you've got to remember
12    that instructions for use, it's a very complex
13    process.  It is in many languages.  So it takes a
14    long, long time to get an IFU out.  And as I read in
15    the instructions for use -- in the e-mail, the
16    instructions for use were already printed, not that
17    that is an excuse, of course; but the fact is that
18    we feel that surgeons doing these procedures would
19    be aware of this possible complication.
20        Q    Medical affairs believes that if medical
21    affairs says that a warning should be included in an
22    IFU, that it should be included; right?
23                  MR. SNELL:  Objection; form.
24    BY MR. SLATER:
25        Q    That the people on the business end should
```

```
00392
  1    not say, no, we're not going to include it, for
  2    example, because we don't feel like reprinting IFUs?
  3    That would not be a legitimate reason not to include
  4    it; correct?
  5                MR. SNELL:  Objection; form.
  6                THE WITNESS:  Yes, but Axel Arnaud
  7    suggests.  He doesn't say it must absolutely go in.
  8    He could have done that.  If he would have felt so
  9    strong about it that in the instructions for use it
 10    wasn't appropriately addressed, then he would have
 11    pushed for it and he could have insisted.
 12                MR. SLATER:  Move to strike after
 13    "Yes."
 14    BY MR. SLATER:
 15         Q    So after Axel Arnaud made this suggestion
 16    that this warning be added to the ProliftÆ IFU two
 17    months before launch -- let's turn to the front
 18    page, which I think you're on, to the e-mail from
 19    Sean O'Bryan on January 13, 2005, two days later.
 20    Do you see that in the middle of the page?
 21         A    Yes.
 22         Q    And Sean O'Bryan points out that "The
 23    PROLIFT IFU is approved through the TAF," T-A-F,
 24    "process and most likely has gone out for
 25    translations and final proof so unless it is
```

```
00393
  1    absolutely necessary we should probably leave it as
  2    is."
  3            Do you see that?
  4        A   Yes.
  5        Q   Now, the last thing that medical affairs
  6    at Ethicon would ever want is for other people on a
  7    team bringing a product like the ProliftÆ to market
  8    to basically say we don't want to have to redo these
  9    IFUs so let's see if we can hold off till later,
 10    till the next time; right?  You agree with that;
 11    right?
 12                MR. SNELL:  Objection; form.
 13                THE WITNESS:  If indeed it's a must
 14    to have it in there, then medical affairs should
 15    have pressed for it.
 16    BY MR. SLATER:
 17        Q   Okay.  Let's go to the next e-mail.  The
 18    next e-mail in the chain just above that is from
 19    Scott Ciarrocca responding to Sean O'Bryan.  And
 20    Scott Ciarrocca says:  "We have already printed
 21    launch stock"?
 22        A   Uh-huh.
 23        Q   Meaning the IFUs have already been
 24    printed; right?
 25        A   Correct.
```

```
00394
  1          Q    And he says:  This would be a next-
  2    revision addition but they want it in there as soon
  3    as possible.
  4               Do you see that?
  5          A    Yes.
  6          Q    And if you go back down to Sean O'Bryan's
  7    e-mail, he talks about the fact that -- he's talking
  8    about Charlotte Owens and Axel Arnaud, both from
  9    medical affairs; right?
 10          A    Yes.
 11          Q    So it's clear from this e-mail that they
 12    want that warning that Axel Arnaud proposed to be in
 13    the IFU as soon as possible?  That's what it says
 14    here; right?
 15          A    Well, Axel Arnaud is no longer on these --
 16    on this e-mail chain.
 17          Q    He's being referred to, when Scott
 18    Ciarrocca says --
 19          A    Yes.
 20          Q    -- they want it in there ASAP, he's saying
 21    Charlotte Owens and Axel Arnaud from medical affairs
 22    want that warning in the IFU; correct?
 23          A    Yes.
 24          Q    That's what it says; right?
 25          A    But I don't see the e-mails or I do not
```

```
00395
  1   know what the conversation was with these medical
  2   directors.  That's not documented here.
  3        Q    The e-mail reflects that Scott Ciarrocca
  4   told Sean O'Bryan that Charlotte Owens and Axel
  5   Arnaud want that warning --
  6        A    Yes, that is what the e-mail --
  7        Q    -- in the IFU?
  8        A    The e-mail suggests that, yes.
  9        Q    If this e-mail accurately reflects that
 10   this warning by Axel Arnaud was not included just
 11   because the launch team didn't want to have to
 12   reprint the IFUs, that would not be a legitimate
 13   reason to keep it out of the IFU; correct?
 14             MR. SNELL:  Object to form.
 15             THE WITNESS:  No.  The legitimate
 16   reason that it didn't have to go in there is that
 17   Axel Arnaud and Charlotte Owens from medical affairs
 18   did not feel the need to put it all on hold because
 19   of that sentence.
 20   BY MR. SLATER:
 21        Q    Well, what it says here is that Charlotte
 22   Owens -- rephrase.
 23             So Charlotte Owens and Axel Arnaud wanted
 24   this warning to be in the IFU as soon as possible,
 25   but they allowed the design team led by Scott
```

```
00396
 1   Ciarrocca to not do so and to hold it to be put in
 2   the next revision --
 3        A    Right.
 4        Q    -- of the IFU because Scott Ciarrocca
 5   didn't want to reprint the IFUs?  That's what this
 6   e-mail shows us; right?
 7             MR. SNELL:  Objection; form.
 8             THE WITNESS:  But it shows that there
 9   was no pushback from medical affairs that it was a
10   reason to stop this IFU.
11   BY MR. SLATER:
12        Q    And, in fact, if medical affairs did think
13   it needed to be there as soon as possible, as stated
14   in this e-mail, medical affairs should have pushed
15   and insisted that the IFUs be reprinted and add that
16   warning; correct?
17        A    Yeah, but the medical affairs is not
18   stating here how -- you know, ASAP is a form of
19   speech, right.
20        Q    If medical affairs thought that the
21   warning needed to be in the IFU --
22        A    Yes.
23        Q    -- medical affairs, acting in the best
24   interest of the patients, should have insisted that
25   the IFUs be reprinted with that warning in the IFUs;
```

```
00397
 1   correct?
 2        A    If medical affairs would have felt that
 3   this was an absolute must, they would not have
 4   allowed this IFU to go forward.
 5        Q    Well, they should not have allowed it if
 6   they thought it needed to be in there; right?
 7                MR. SNELL:  Objection; form.
 8                MR. SLATER:  But they didn't.
 9   BY MR. SLATER:
10        Q    Well, just because they didn't doesn't
11   mean they didn't think it should be there.  They
12   could have just not fought hard enough or not done
13   their jobs, that's one possibility; right?
14                MR. SNELL:  Form; objection.
15                THE WITNESS:  Axel Arnaud has a long
16   track record in our company of getting devices that
17   are efficacious and safe on the market and I have a
18   lot of respect for him.  He did not feel the need to
19   stop this IFU from being printed and going to the
20   market because he felt that in the end what was in
21   the instructions for use, what was in the adverse
22   events was appropriate and actually covered it.
23   BY MR. SLATER:
24        Q    So Axel Arnaud suggested this extensive
25   warning --
```

```
00398
  1         A    Yes.
  2         Q    -- be added to the IFU even though he
  3    thought it was already a subject that was covered
  4    adequately in the IFU?  Is that what you're telling
  5    me?
  6         A    I think Axel believes, and I see his
  7    point, that if you would add that to the IFU, it
  8    would make -- it would clarify it.  But it is not
  9    stating something that isn't in there.  I think that
 10    is the key point and that is the reason why Axel did
 11    not push harder.
 12         Q    Medical affairs acts in the best interest
 13    of the patient; right?  They're supposed to anyway;
 14    right?
 15         A    Correct.
 16         Q    And if medical affairs allowed the project
 17    team to not include this warning at the initial
 18    launch but to wait till the IFUs were going to be
 19    printed again just because the team putting the
 20    product on the market didn't feel like reprinting
 21    the IFUs at that point, that would not have been
 22    appropriate; would you agree with that statement?
 23              MR. SNELL:  Objection; asked and
 24    answered.
 25              THE WITNESS:  Would you repeat the
```

```
00399
  1  question?
  2              MR. SLATER:  Could you read that
  3  back, please.
  4              (The court reporter read the record
  5  as follows:
  6              "QUESTION:  And if medical affairs
  7  allowed the project team to not include this warning
  8  at the initial launch but to wait till the IFUs were
  9  going to be printed again just because the team
 10  putting the product on the market didn't feel like
 11  reprinting the IFUs at that point, that would not
 12  have been appropriate; would you agree with that
 13  statement?")
 14              MR. SNELL:  Note my objections.
 15  Thank you.
 16              THE WITNESS:  I would agree with the
 17  statement, but that is not what happened.
 18              MR. SLATER:  Move to strike from
 19  "but" forward.
 20  BY MR. SLATER:
 21      Q    Now, go if you could -- it's going to be
 22  the next notebook, sir.
 23      A    Okay.
 24      Q    Exhibit 407.
 25              MR. SLATER:  Hey, I have an extra
```